Good morning. I'd like to reserve five minutes of rebuttal time. Okay. If you keep your eye on the clock, it counts down. Okay. Thank you, Your Honor. My name is Scott Davis. I am the attorney on behalf of Richard Kludka. And I want to first say it's an honor for me to be here before the court and also to represent him. This is an interesting case in that I think it follows the statement from Judge Brandeis, who decades ago taught us that sunlight is the best disinfectant. Mr. Kludka, who was a disabled employee at Qwest and had been paid benefits for seven years before his benefits were terminated, suffered from numerous psychiatric disorders. His claim had been reviewed on a number of occasions over the course of six years, and benefits were continued up until 2006. May I just ask a preliminary question? You're not challenging the district court's determination that there is no conflict of interest here as there was in Abati. Is that correct? Your Honor, I do believe that there were some conflicts of interest that tainted the decision, but I don't believe there is the classic structural conflict of interest that Glenn suggested where the payor of benefits is also making the decision. That's the way I read your brief. That would be correct, but I do think there were nonetheless conflicts that tainted the decision. For one, Qwest self-insures the trust that the benefits were paid out of and they saved money. But not structural. Not as structural. Thank you. That's correct. This case, I think, allows the court to expand further into what it has already done so far and Montour most recently and also the Saloma case just a couple of months ago. There are a number of areas, as I briefed, but perhaps most importantly is for the court to certainly understand that Mr. Kludka was not represented at the administrative level of review before Qwest. I did not get involved in the case until after litigation ensued. He found himself grappling with the denial of his benefits up against a $14 billion a year company and no ability to really understand medical terminology, as he stated in his appeal letter to Qwest in September 2007, that he didn't understand how to self-diagnose and didn't understand medical terminology. That issue is important because I think that's one of the big issues in this case, is given that he was not represented, I think that Qwest had perhaps even more of an enhanced duty to engage him in a dialogue as Boutin requires, as Safran requires, and Montour recently required, and unfortunately that didn't happen, particularly with regard to one of the main reasons why his claim was denied or benefits were terminated, which was the lack of objective medical findings. The plan does require that the claim be documented with objective medical findings. It's interesting to note that Mr. Kludka's medical conditions, his psychiatric diagnosis, had stayed the same from 1999 all the way up to 2006. His board certified treating psychiatrist, who had treated him for three years before his benefits were terminated, had filled out numerous forms that Qwest asked her to, providing objective medical findings, impaired concentration, inability to deal with stress, agoraphobic, et cetera. Those were accepted up until 2006 before benefits were terminated. At what point, oh, I'm sorry. At what point, I gather at some point Qwest changes their evaluator and administrator to this read group that has a couple of different names. At what point does that happen prior to the review of your client's claim that then results in the denial? Thank you, Your Honor. My understanding is that the read group came in, I believe, in 2004, but his claim was not reviewed that first year. So it may have been reviewed once by read and benefits were continued, and then on the second review benefits were to conflict, his benefits were continued following an annual review from 1999 all the way up to 2004, and then something changed, and what changed was the third-party administrator, read review services. You put a little bit of stuff in the record suggesting that Dr. Reed is rather hostile to disability claims. Is there anything beyond his statement that we get reported, which is after he's been hired, his group's been hired, that substantiates that? Your Honor, the answer is not that I have in my possession, and one of the issues that plaintiffs unfortunately frequently deal with in these cases, as you're aware, is limited discovery. And so the information that I found regarding Dr. Reed, if true, was something that I pulled from the Internet, and certainly does raise some questions about the fairness of read group's ability to impersonally evaluate claims. But I was allowed several depositions of the quest claims people, but in terms of the discovery order that was issued by the district court judge, those issues were not allowed. We were supposed to follow a previous discovery order that he had issued, which was somewhat limited in its scope and didn't include that. I'd like to ask about the reasonable basis test. You submitted a 28-J letter alerting us to Saloma that you referred to versus Honda and pointed out that Saloma overruled the reasonable basis test. But from my reading, the Saloma court perhaps misunderstood that the any reasonable basis test is still good law, witness the Montour case. What is your response to that? Your Honor, my response is that in the Saloma case, the Ninth Circuit said that they were specifically overruling Senawe as it related to the any reasonable basis test. And my review of the case, I think, suggests that the Ninth Circuit decided to follow the Supreme Court in Concord where the standard for abuse of discretion was whether or not there was a reasonable basis for the decision as opposed to any reasonable basis. So I do see a distinction in terms of what the Ninth Circuit did in Saloma, because in this particular case, I think a review of the district court's decision here really indicates that all the judge was doing was looking for any reasonable basis. But the Montour case said, and this is why I asked about conflict of interest, that the reasonable basis test is still good law where there is no conflict of interest. Isn't that correct? I think that is correct, that that's what Montour said. But all I can certainly argue this morning is what Saloma said, which is that it was overruling Senawe to that extent. But that brings me to, I think, an important issue in this case, which is that I think, although I have extensively argued that conflict was a factor and was an issue for some of the reasons that I suggested, whether it may have been Dr. Reed, whether it may have been the peer review reports, I don't know that conflict was determinative in this case, much like Glenn. In the Glenn case, the Supreme Court basically held that conflict was an issue, but it wasn't dispositive. And there were other factors that the court looked at, such as the quality and the quantity of the medical evidence, whether or not the insurance companies reviewing physicians had all of the evidence in the case. And in this particular case, the appellee has discussed Dr. Bevin's IME, and I think Dr. Bevin did a thorough IME, but it's important to note that he actually said that Mr. Klutka was disabled for a period of time. I've got a question about the initial evaluation by Dr. Kelly Clark. Dr. Clark indicates, I think Dr. Clark is a woman, she, or should it be he? I'm not sure. Okay. Dr. Clark indicates that he or she made three phone calls on three successive days to the treating psychiatrist of your client, didn't get a response, and then without a response, so without talking to the treating psychiatrist as of the present condition or for evaluation of the written reports and so on, issues a finding that he's not disabled. Is there something wrong with Dr. Clark not having spoken to the treating psychiatrist before making that evaluation? I think it goes to the, particularly in a case like this where there's psychiatric issues involved, which is one of the cases that I cited where I think an IME is important, particularly given the change in circumstances from the Dr. Bevin IME. It's clear in the medical records that Mr. Klutka's condition deteriorated as based on his GAF score, his global assession of functioning score, which was at a 50 consistently during the entire time on appeal. Dr. Clark did call Dr. Simino, the treating psychiatrist. Mr. Klutka, again, explained that she apparently only worked two days a week, and there were apparently some money issues. I don't know if Mr. Klutka had to pay for her to talk to him, but actually Dr. Clark did talk with Dr. Simino in January 2007, and I think Dr. Simino at that point said that he still was not back at a point where he was able to work, in so many words. Well, what I'm after in that question is it seems to me procedurally odd, at the very least, for someone revealing a file to determine whether somebody continues to be disabled, making a determination without talking to the psychiatrist who's the treating psychiatrist, and we all know the human tendency, once having reached a decision, takes a little bit to move you off of the decision. So a phone call at the last minute before the second report prepared by Dr. Clark to Dr. Simino, the treating psychiatrist, strikes me as at least an indication that there was no serious attempt to get the in-person evaluation of that doctor. Your Honor, I think that is correct. What I find more troubling, though, actually, is that one issue is what you just referenced. Dr. Clark reviewed Mr. Klutka's case on two different occasions, about six months apart, and not surprisingly, he agreed with himself both times. What's more troubling, though, I believe, is actually what happened on appeal, which is Quest sent it to a different psychiatrist, Dr. Goldman, who his report, which really, in my opinion, based on Montour, is the only quantity of evidence on appeal. He's the only psychiatrist that saw all of the evidence. Quest never asked him to call Dr. Simino. They never called Mr. Klutka to see how he was functioning. They never asked him to call Mr. Goldman, his longtime therapist. And Dr. Goldman clearly takes a number of shots at Mr. Klutka, that it's not at all clear what this individual does day to day. Well, it was clear in the medical records. His GAF score was a 50, consistently with Dr. Simino, which indicates serious and severe limitations from a psychiatric standpoint. But what happened with Dr. Goldman is two paragraphs, about 16 lines of analysis, none of which really dealt with the evidence in terms of Dr. Simino's medical records or the attending physician's statements, where they clearly said Mr. Klutka couldn't work. And Dr. Goldman went ahead, didn't suggest another IME, didn't call anyone, and made the decision to deny the claim, which, as I will address in my rebuttal time, brings us to the next biggest problem, which is, as I argued in my briefs, Quest and Reed Group clearly outsourced this decision. The claims manager, Ronnie Dodson, was not even involved in making the decision. She testified under oath to that. She basically just adopted what Dr. Goldman had to say and really never scrutinized it or questioned the accuracy of it. Well, and she admits in the deposition that she doesn't even know what a GAF score means. She's very clear in saying, listen, I don't know, I don't understand this medical stuff. That's correct, Your Honor. Perhaps even more troubling, though, was Ms. Macken's testimony, their 30B6 deponent who was the claims manager who looked at the case and made the first amount. She actually testified in my questionings that she did understand what a 50 GAF score was but apparently didn't do anything about it. Okay. Why don't we hear from the other side, and you've got some time for rebuttal. Good morning. My name is Karen Dewalt, and I represent the appellees. I'd like to start by addressing a couple of issues that Mr. Davis responded to. First, as far as what changed to cause the change in the decision in 2006, it is not correct that Quest hired a third-party administrator for the first time in 2004. In 2004, Quest changed third-party administrators. That was my question, and that was his answer, precisely as you're now saying. Oh, I apologize. I thought he said that Quest itself administered the third-party administrators. No, no. My question was not whether they did it for the first time. My question was when did they change to the Reed Group. Okay. And that is correct. It was 2004. But as far as what caused the decision to change, there is significant evidence in the record to indicate that Mr. Kludka's condition had changed from the time his initial claim was granted in 1999 until 2006. What is that evidence when both of his treating, one physician and the other one is sort of a social worker, psychiatrist, psychologist, both of them say that it really has not changed, that he continued to be disabled. So what evidence do you have that the condition has changed? The evidence that supports the change is the objective medical evidence, as opposed to their conclusions that he's disabled. For example, from 1999 until approximately 2004, his treating providers were reporting that he was having daily panic attacks or multiple panic attacks every day. They were reporting, excuse me, different types of objective medical evidence. In 2005 and 2006, the providers would fill out forms that were supplied by the Reed Group that were designed to elicit objective medical documentation. And on those forms, they indicated their observations about Mr. Kludka's behavior, his insight, his judgment, his cognitive abilities, his ability to concentrate. And during that time period, up until the initial denial, his treating providers were indicating on those forms that his mental status examinations, which is the objective medical documentation, was unremarkable or normal. So, for example, they would indicate that his insight and judgment were good, that his concentration was good and intact, that he was well-groomed, that he was able to take care of his activities of daily living. I think the word was acceptably groomed. Acceptably groomed. I believe that may have been in the IME report. I don't think his providers used that word. The providers were, his providers, up until the point of the initial denial, were indicating things like he, his outlook had improved. They were showing that his assessment had improved, that his GAF scores had improved.  As I look at those GAF scores, in the early period oftentimes they were as high as 60 and then they were down to 50, right? Yes, Your Honor, and in the earlier period. And is a high score good or bad? A high score is better, but a GAF score is one factor among many that the doctors were looking at. And is a GAF score an objective factor? I believe a GAF score is a combination of objective and subjective factors. It's an assessment of functioning which is based partly on objective observation and partly on the claimant's subjective. But as I look at the GAF scores on a timeline that's in the record, in an earlier period when he was considered disabled and payments were being made, there were several occasions on which he had a 60. Yes, Your Honor, and he also. And now at the time that he's being evaluated, both of his treaters say it's a 50. At the time his scores were 50, it was after his benefits were denied. When his benefits were denied, his scores were in the 55 to 61 range. 61 was the score that the IME physician assessed. The scores dropped after his benefits were denied, and that was something that the reviewing physicians anticipated. They indicated in their opinions that it would be expected that when Mr. Kludka was told that he would have to return to The other point that I'd like to make about those GAF scores is that in the period of time where they're in the 50 to 55 range, Mr. Kludka was going through some significant personal turmoil in his life, and his doctor's reports indicate that, for example, on one occasion when his score was a 50, he had had a fire in his house, he had suffered from a poisonous spider bite and was on opiates, impairing his concentration, his stepfather had died, and he had, quote, divorced his daughter and his grandchild. All of those factors were submitted to the doctors who reviewed his case. There's a sentence in the district court's order. I'm on page three of that order, the end of the runover paragraph. The district judge writes the denial letter, that's the February 5, 2007 letter, quote, the denial letter stated that Kludka would be reinstated to his previous employment position with accommodations. Is that true? I don't see anything in the record to support that, Your Honor. I looked back at the letter, I found no such thing. I found a statement that Dr. Bevin had said that he could go back to work gradually, starting maybe two hours a day, and that maybe that could be increased and so on. But I saw nothing in any denial letter or any report that said that Quest had promised to give him back his position or that it promised to do so with accommodations. No, and I don't believe that's the case. I think he was wrong on that, but I would also submit that that doesn't matter, that whether or not a person is disabled under the terms of the plan doesn't depend on whether they have a job to go back to. Now, Dr. Bevin says, and you obviously rely in part on what he says, he says, well, he can go back to work if he starts gradually, and if he works maybe two hours a day. Are we talking some sort of theoretical work, or are we talking about the real world? Meaning, in this economy, for somebody to say, I've been out of work for, oh, seven or so years because of severe psychiatric problems, I'd like to have a job with you so I could just work for a couple hours a day, and then maybe if it works out, I'll go back to full time. Realistically, there is no such job. Is this based on a hypothetical job? Well, first, I don't necessarily agree that there is no such job. Well, you go find one that says, listen, I've been out on psychiatric disability for seven years, and I'd like to start two hours a day. Well, I would agree that if you present it that way, it's probably better. But that's exactly what Dr. Bevan says he's capable of doing. He does not say he can go out and work eight hours a day. Well, what Dr. Bevan said is that it would take him some time to gradually reintegrate into the workforce. Starting out at work, two hours a day. And there's nothing in the record to indicate whether Mr. Kludka attempted to try to find a temporary job, to try to reacclimate him into the workforce, whether he tried to find any kind of employment rehabilitation that would try to get him back into the workforce. But let me ask my question now at kind of a policy level, in the sense of your policy, not policy in the abstract of what a policy ought to be, but your policy. Are you required in order to terminate benefits based on change condition to show that the sort of work that your people say he can do is something that's realistically available? Not under the terms of the plan. The plan requires that the claimant be able to do work that would provide more than 60 percent of his income. Do work, but not just require that he be able to get a job? No, it does not. That's a weird policy. If he's unemployable, and you say, nonetheless, your disability policy doesn't kick in, because we think you are capable of doing a job at which you would earn 60 percent or more of your prior salary, but he says, I'm unemployable in the conditions that you've just said I'm capable of fulfilling, it doesn't make any sense to me. Well, I think one of the things that is troubling here is that Mr. Kludka didn't try. I could see that argument if he had tried to find another job, or tried to get rehabilitation services through the State of Arizona, or had made some effort to do temporary work to try to get himself back into the working mindset. But he did none of that. Well, one of the doctors said he's just used to not having to work. But isn't it true he had an alcoholic son, he had a daughter suffering from ovarian cancer, and he had two autistic grandchildren that he had to deal with them? Yes, Your Honor, and there is some evidence in the record to indicate that his condition actually got worse when he stopped working, and Dr. Bevin asked him why he thought that was. And he responded it was because he had a drama queen daughter and two autistic grandchildren. So a reasonable inference from the record is that going back to work would remove Mr. Kludka from some of his personal stressors and could, in fact, be therapeutic. You know, I confess I'm importing my own personal experience to that. If I'm worried about my kids, going to the office does not decrease my worry about my kids. Well, Mr. Kludka... So you say it's a reasonable inference that if he goes to work he's not going to worry about his drama queen cancerous daughter and two autistic grandchildren. I'm not sure that's a reasonable inference at all. Well, but it's his direct statement to Dr. Bevin. Dr. Bevin asked him why is it that your condition worsened when you left work, and that was his response. I'm not sure that's quite what his response was. After he left work, these conditions developed in his daughter and his grandchildren. I don't know whether that's the case. That's not in the record. What is in the record is that he was asked the question why did your condition get worse when you left work, and his response was because I have a drama queen daughter and two autistic grandchildren. I'd like to make one correction before I run out of time, and that is with respect to your question about Dr. Clark's efforts to contact Dr. Samino. It is not true that the only contact he had was right before the final denial in 2007. At page 397 of the record, it indicates that ‑‑ Hang on a second. Hang on a second. 397. Page 397. Okay. I'm with you. And those are the notes that are taken by the claims manager daily about her handling of the claim. So after the initial denial in the summer of 2006, Ms. Macklin had a conversation with Mr. Kludka where he explained that Dr. Samino worked a part‑time schedule, and Ms. Macklin asked Dr. Clark to go back and speak with Dr. Samino. He did so on July 20th, 2006. And following that conversation, Ms. Macklin ‑‑ Hang on a second. Called EE. Who's EE? And advised that RRS. Who's RRS? Reed Review Services. RRS has spoken with his doctor, and based on the medical information provided in the discussion, it was determined that the denial would remain in place. I advised him the next step would be to request an appeal. He thanked me for nothing but thanked me for the call. Now, how do we know that RRS is Dr. Clark? Because at that point the only doctor that Reed Review Service had used to evaluate the claim was Dr. Clark. And at what point does Dr. Clark then re‑review the record and deny? He re‑reviewed the record and denied again after the IME. So the chronology of events was that Dr. Clark reviewed the record, attempted to contact Dr. Samino three times and wasn't able to reach her. The denial was issued. Ms. Macklin then talked to Mr. Kludka and went back to Dr. Clark and asked him to try again on the days that Mr. Kludka said she would be working. He successfully reached her. The denial was reissued, but then there was a decision made to have Mr. Kludka go for the IME, which he did. What was the date on which Dr. Clark issued the first evaluation that he's not disabled? It was June 20, I'm sorry, June 12, 2006. June 12. And what are the dates on which the three phone calls were made to Dr. Samino that were unsuccessful? It was June 6, June 7, and June 8. Actually, I've got June 6, 7, and 8 in your documents. But that means that June 6, June 7, June 8 phone calls were made, no response, and then a written report saying not disabled filed on the 12th. Dr. Clark didn't wait very long to find out what the physician treating the psychiatrist was going to say. Didn't wait much at all. Is that a good practice? He waited a week. He tried three times a week from the initial attempt. And he files the report six days after the first attempt. I assume that he began writing the report before the 12th, if he files it on the 12th. It's not a very long time. I have no way of knowing that. But the medical information that Dr. Samino had submitted in her progress reports prior to that initial denial indicated no her mental status examinations indicated that there were no symptoms that would indicate disability. But as soon as we get actual person-to-person contact with Dr. Samino, what does she say? Does she say he's disabled? I believe she said he was disabled. So it's a fair guess that if Dr. Clark had talked to Dr. Samino before making that initial evaluation on June the 12th, Dr. Samino probably would have said he's disabled. I'm sure she would have, because that's what she said in her progress reports. But Dr. Samino's conclusion that he was disabled doesn't necessarily make it the case. The plan administrator is the person who has delegated the authority to make the decision about whether a medical condition renders the person unable to work. Okay, I'm taking you over time, for which I apologize. What bothers me about this case is that all of your reviews, except for the review by Dr. Bevan, were on paper. The very first review by Dr. Clark was done on paper without even talking to the treating psychiatrist. Dr. Bevan, the only doctor to have conducted an in-person interview with Mr. Kledko, says he can go back to work, but under quite odd and restrictive conditions, starting only at two hours per day, and so on. The district judge misinterprets that as saying that the company has offered him a job to come back with those conditions. This just doesn't feel right to me. What the evidence here shows is that the Reed Group, who had no financial incentive to deny this claim, in fact, it's the opposite, because they have a duty to defend and indemnify for wrong decisions. Duty and incentive are different terms. True, but I think the evidence here shows that they went farther than you see in almost any other case in trying to fairly evaluate Mr. Kledko's claim by sending it out to five different, for five opinions. And none of those opinions vary substantially from Dr. Clark's initial opinion rendered on June the 12th, except for the opinion of Dr. Bevan, the only person in person to do an interview, who concludes that he can only go back to work starting at two hours a day. For a month, yes, which he did not attempt to do. Thank you. Response. As Your Honor noted, Dr. Bevan in August of 2006 said that essentially he couldn't work at that time, but maybe he could make a graduated return to work over the course of 120 days, which basically meant he was still disabled, because he needed to make 60 percent or more of his predisability income. So going forward 120 days, we get to about December 2006 or January 2007, and that's when Dr. Simonow actually filled out an attending physician's statement for Quest. Here's what she had to say. He's unimproved. His ability under concentration, his ability to sustain concentration, focus and complete tasks in a work environment, poor, overwhelmed by anxiety. This is January 2007. The reason why Mr. Klutka did not attempt to make a return to work is because Dr. Bevan had it wrong. His condition deteriorated, as the medical records show, from August of 2006 all the way through October of 2007. His GAF was consistently a 50, and then partly because his benefits were cut off in May of 2007, he suffered a heart attack and had a triple bypass surgery. Now, going forward then just literally three weeks before the final denial from Quest, Mr. Golden, in an attempt to again communicate with Quest and inform them, you've got this one wrong, let me tell you what's going on with Mr. Klutka, here's what he had to say. His anxiety, panic symptoms consist of panic attacks on a frequent basis, from five to seven times per week. He endorses symptoms of swearing, chest pain, palpitations, nausea, lightheadedness, dizziness, and a fear of dying. Of significant note is Mr. Klutka's fear of dying has intensified since his recent cardiac symptoms and surgery. He has severe feelings of hopelessness, helplessness, symptoms of depression include low energy, poor motivation, his daily functioning is very limited as well, he's socially withdrawn, he's isolated within the exception of attending church, he's sleeping as much as 15 hours a day. To answer Dr. Goldman's question in his peer review, it's not at all clear what this individual does on a daily basis. This is what Mr. Klutka was grappling and dealing with on a daily basis. Dr. Goldman just chose to ignore it. Wasn't Dr. Goldman suggesting that if he returned to work, a lot of these symptoms would disappear? That may have been what Dr. Goldman suggested, but it was against all of the evidence in the record. There was no evidence to suggest that he was able to return to work. In fact, Mr. Goldman in the letter that I just referenced said during the course of treatment, his symptoms have precluded him from the opportunity to return to employment of any kind. Given this, the topic of returning to work has not been addressed in his treatment, nor was it a goal. So that may have been what Dr. Goldman said, but again, looking, if you scrutinize Dr. Goldman's report under the lens of Montour, it is a pure paper review, it's scant with any kind of support in the record, and it's against the weight of all of the evidence, the medical records, the opinions from the treating physicians going back for the last year. The other issue that Dr. Goldman never addressed was what Mr. Golden did, which is the combination of the problems that happened after May of 2007. Once Mr. Klutka had a triple bypass surgery, his benefits were cut off, he was living only on social security disability, he now had a combination of problems leading up through the October 2007 denial, which is a fear of death, cardiac symptoms, and all of that played into his psychiatric functioning. Your time has run, in fact, we're taking you over, but I've got one last question. I did notice in the record that Mr. Klutka is receiving social security benefits for disability. Are you familiar with the standards of disability applied by the Social Security Administration compared to the standard of disability under this policy? I am, Your Honor. I do social security disability. And is it harder to be disabled under the social security criteria than under this policy? That's a good question. I haven't thought about that. I think that it's probably harder to be approved for social security disability because you have to be unable to do any job day in and day out. With the Quest plan, if you can make 60%, that's the standard. I don't think that it's, I think social security is a tougher standard to meet, and he was getting social security during the entire time frame. So social security continues to pay him payments under the social security standard, which is to say any employment. That's correct, Your Honor. Okay. Thank you. Thank you. Case of Klutka v. Quest Disability Plan is submitted for decision.
judges: Duffy, Nelson D. W., Fletcher W.